**Linda REYNOLDS, Ancillary Executrix of the Estate of Arthur Dalton Reynolds, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. C–C–89–167–M.**

United States District Court, W.D. North Carolina, Charlotte Division.

Oct. 30, 1992.

Paul B. Guthery, Jr., Horack, Talley, Pharr & Lowndes, Charlotte, N.C., for plaintiff.

James M. Sullivan, Asst. U.S. Atty., Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

TAYLOR, United States Magistrate Judge.

Linda Reynolds, the executrix of the estate of Arthur Dalton Reynolds, filed this wrongful death action against the United States claiming that her husband was killed in an automobile collision by the negligence of National Guardsmen who were driving the other vehicles involved in the fatal accident. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1346(b) and § 2671 *et seq*, the Federal Tort Claim Act.

The case came before the undersigned[1] for a nonjury trial on June 8 and 9, 1992. During this stage of the trial, the plaintiff presented all of her evidence and rested. The defendant presented all of its eyewitness testimony, and then, by prior agreement between the parties and the Court, requested and received a recess to permit the defendant's expert witness sufficient time to analyze the testimony and computer data presented during the trial by the plaintiff's expert witness. The trial resumed on October 15 and concluded on October 16.

---

1. By consent of the parties and pursuant to 28 U.S.C. § 636(c), the undersigned United States Magistrate Judge conducted the trial of this case.

After carefully considering the evidence presented at trial, the arguments of each party, and the relevant authorities, the undersigned herewith enters the following findings of fact, conclusions of law, and decision.

## I. FINDINGS OF FACT

1. On January 11, 1986 at approximately 5:30 a.m., Arthur Dalton Reynolds left his home in Fort Mill, South Carolina to go to work at the Accuride plant in Charlotte, North Carolina. Reynolds was driving a Chevrolet Custom Van, and took his usual route driving north on North Carolina highway 160.

2. At about the same time, a convoy of National Guard trucks departed from York, South Carolina driving first on highway 49 into North Carolina, then south on North Carolina highway 160 on their way to Interstate 77. The convoy's ultimate destination was Fort Pickett, Virginia.

3. At all times relevant to this case, the guardsmen were on an official assignment for the National Guard, and were thus agents and employees of the United States, acting within the scope of their office or employment as defined in 28 U.S.C. § 2671.

4. Prior to leaving York, S.C., the guardsmen had a safety meeting to make sure that everyone was alert and knew the route to Fort Pickett.

5. Bobby Cox, a professional truck driver in his civilian occupation, was assigned to drive the lead truck, a 2½ ton standard military transport truck with a ¼ ton trailer in tow.

6. Prior to this date, Cox had been authorized to drive trucks from ¼ ton up to 52 tons; had driven 2½ ton military trucks for over twenty years; had driven on N.C. highway 160 many times in both his personal car and in tractor trailer trucks; and had a "perfect" driving record.

7. Johnny Dover rode as a passenger in the front seat of the truck driven by Cox.

8. John Allison was assigned to drive the second 2½ ton truck, with Sgt. Samuel Easter, Jr. as a passenger. A third and smaller vehicle driven by Sgt. Husky, with Sgt. Harmon Merritt as a passenger, followed the first two trucks.

9. At approximately 5:45 a.m., at a slight curve on North Carolina highway 160 in Mecklenburg County, Reynold's van and the truck driven by Cox sideswiped each other. The front left tire of Reynold's van blew out, and the metal rim of the tire began to gouge into the road surface. Reynold's van then crashed head-on into the second truck in the convoy driven by John Allison. The van was demolished and Reynolds was killed instantly.

10. Mr. A.W. Belk, a Mecklenburg County Police Officer at the time of this accident, testified that he investigated the accident scene beginning at approximately 6:15 a.m., and prepared the written police report which was introduced into evidence as Government's Exhibit #1. Officers J.K. Williams and S.L. Price also testified with regard to their participation in this investigation. Working together, these officers obtained and recorded the following physical data:

a.) broken glass (believed to be from the left side mirror of the van) was found in the middle of the roadway, south of the van's final resting place, with the greatest concentration within an 18 inch diameter area.

b.) a continuous arching gouge mark (also called "rim marks" during the testimony) originated in the van's lane of travel approximately 52 feet 8 inches from the center of the broken mirror glass, and ran 86 feet 4 inches to the blown out left front tire of the van at its final resting point.

c.) the total distance from the center of the broken mirror glass to the front left tire of the van was 139 feet.

d.) the south bound lane in which the trucks had been traveling was measured from the edge of the asphalt to the center crease mark in the middle of the road and found to be ten feet. Also for the south bound lane, the width from the inside edge of the outside white line to the inside edge of the first yellow line in the center of the road was measured to be nine feet.

e.) the total width of the roadway was 19 feet 8 inches from asphalt to asphalt.

f.) the distance from the lead truck's final position to the center of the broken mirror glass was 345 feet.

g.) the width of the lead truck, measured from side mirror to side mirror (with the bent left side mirror straightened out) was 9 feet 8 inches.

h.) the painted lines in the center of the highway were each approximately 2 and one half inches wide.

i.) there were no visible skid marks for any of the vehicles involved in the accident.

The officers also took numerous photographs of the accident scene and vehicles. These photographs were received into evidence to illustrate the testimony of the witnesses.

11. Mr. Charles Michael Dickinson was qualified to testify for the plaintiff as an expert witness in accident reconstruction. Mr. Dickinson began investigating this case in June 1991, five years after the accident occurred. Using measurements from the police accident reports and gouge marks still present in the road surface, Mr. Dickinson input this known data along with a variety of other known and assumed factors into an accident reconstruction computer program known as "EDSMAC." After examining the many computer simulated results, Mr. Dickinson rendered the opinion that, at the time the sideswipe occurred, the lead National Guard truck was about one foot over the center line of the highway in Reynolds lane, and that Reynolds was properly in his own lane and traveling the speed limit of 55 miles per hour. Mr. Dickinson conceded, however, that the computer program which he used contained the cautionary statement that "[i]t is not intended that the user should consider the results as the only way a particular accident could have occurred."

12. The government offered the testimony of Dr. L. Ellis King, chairman of the Engineering Department at the University of North Carolina at Charlotte. Dr. King, an engineering professor since 1967, was also qualified by the court as an expert witness in the field of accident reconstruction. Although Dr. King admitted to making a miscalculation in a sample run of the same computer program used by the plaintiff's expert, he also testified that the EDSMAC computer program could not provide a reliable answer as to which vehicle was on the wrong side of the road at the time of the initial sideswiping. Dr. King further stated that there was simply insufficient data from the accident in this case for him to render an opinion as to the speed and position of the van and the lead truck at the initial point of impact.

13. Both expert witnesses testified that the clashing of the two side mirrors did not cause this accident. Mr. Dickinson specifically testified that the initial significant impact occurred when the front left edge of the van struck the front left edge of the lead truck's flatbed frame. Mr. Dickinson further testified that, upon examining an exemplar truck of the same make and model as the lead truck in this case, he found the flatbed frame of such truck to be 95 and one half inches wide.

14. Mrs. Linda Reynolds, and Mrs. Tammy Reynolds Morris, respectively the wife and daughter of Arthur Reynolds, credibly testified to the tremendous loss caused to them by the death of Arthur Reynolds. Family friends also testified about the Reynolds family and the loss suffered by Mr. Reynold's untimely death. Included in this testimony, Mrs. Reynolds established that Mr. Reynolds would have earned $1,400,000.00 gross wages up to the time of retirement at age 65, and that after taxes and personal consumption, this figure would be reduced to $557,000.00. Funeral expenses totalled $4,993.00. The loss of the intangible benefits of Mr. Reynold's companionship, love, and support was not articulated by any witness in any dollar amount, but the sum of all the testimony is that it was indeed a tremendous loss.

15. Although Mr. Dickinson was a credible and enthusiastic witness, because of the actual and stated limitations of the computer program, the arbitrary and assumed nature of much of the data fed into the program, the fact that the measure-

ments taken by the police at the accident scene were only estimates, the lack of knowledge about significant other factors which may have influenced the collision, and the small margin for error, the undersigned finds that the results of the computer program and Mr. Dickinson's ultimate conclusions are unreliable as to the ultimate question of which vehicle was over the center line of the highway at the time of the initial sideswipe.

16. Moreover, Mr. Cox credibly testified that immediately prior to the accident, he was driving the lead truck at about 40 to 45 miles per hour with his headlights on, keeping his right front tire along the edge of the right side of the road. Cox had driven this type of truck on this road before and was aware that his side of the road was wide enough to accommodate the truck. Cox saw Reynold's van approach and cross the midline of the highway. Cox pulled his truck sharply to the right, and had his right front tire off the road surface when the van crossed the middle of the road and sideswiped him. Mr. Cox's trial testimony was corroborated by the statement he gave to the investigating police officer immediately after the accident. As related in the police report, Mr. Cox (identified as "driver # 2") "stated that vehicle # 1 (Plaintiff's van) was in the wrong lane" and that "he (Mr. Cox) attempted to avoid the accident by pulling onto the right side of the road but vehicle # 1 sideswipe[d] his vehicle." Government's Exhibit # 1, p. 3.

17. John Allison, the driver of the second truck credibly testified that he was driving at 35 to 40 miles per hour some 150 feet behind the lead truck when he saw the lead truck moving over to the right side of the road. To the best of Allison's knowledge, the van crossed the middle line before hitting the lead truck. Allison also stated that the lead truck did not cross the midline of the highway. After the van sideswiped the lead truck, it crashed head on into Allison's truck. Allison further estimated that the van was going faster than 55 miles per hour at the time of the sideswipe.

18. Although passengers in the first and second trucks provided testimony which conflicted in part with that of the two drivers, the undersigned resolves these conflicts in favor of the perception and memories of the drivers. Cox and Allison were simply more credible, and, as the drivers, would have been more alert to the events as they transpired.

19. By the preponderance of the evidence, the undersigned finds that the two National Guard trucks involved in this accident were at all times properly on their own side of the road.

20. By a preponderance of the evidence, the undersigned finds that Mr. Reynolds drove his van across the midline of the highway, sideswiped the first truck, lost control of the van, and then crossed the midline again to crash head on into the second truck.

## II. CONCLUSIONS OF LAW

■ The Federal Tort Claim Act, 28 U.S.C. § 2671, *et seq.* provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Actions brought under this statute are governed by the substantive law of the state in which the alleged wrongful conduct occurred. 28 U.S.C. § 1346(b); *Starns v. United States,* 923 F.2d 34 (4th Cir.); *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). In this case, North Carolina's Wrongful Death Statute, N.C.G.S. § 28A–18–2, traffic laws, and general negligence principles guide this court's decision. The burden of proof is on the plaintiff, who must establish that the agents of the defendant committed some negligent act or omission, and that such negligence proximately caused the accident. 9 *Strong's N.C. Index 3rd,* Negligence § 26.

The plaintiff contends that Bobby Cox, the driver of the first truck in the convoy was negligent in three respects: (1) he drove a truck that was wider than 96 inches on a state highway in violation of N.C.G.S. § 20–116; (2) he failed to keep his truck on the right side of the highway in

violation of N.C.G.S. § 20–146; and (3) he failed to give Mr. Reynold's van one half of the road as required by N.C.G.S. § 20–148.

 Having considered all of the documentary and testimonial evidence, the undersigned finds that the plaintiff has failed to carry her burden of proof. In the first place, the only evidence that the first truck crossed the center line of the highway was the opinion of the plaintiff's accident reconstruction expert. However, as discussed above, that expert's ultimate conclusion that the first truck was one foot inside Mr. Reynold's lane of travel, based solely on his own simulated computer runs, is simply not reliable. The computer program instructions themselves candidly admit that the results do not establish how an accident happened, only how it might have happened. "Might have" does not carry a burden of proof requiring the establishment of negligence by a preponderance of the evidence.

Moreover, credible eyewitness testimony established that the National Guard trucks were properly on their own side of the road, and that it was Mr. Reynold's own negligence in crossing the center line of the highway that caused the accident. This eyewitness testimony is further corroborated by physical evidence found at the scene. It is undisputed that the broken mirror glass from the van's side mirror was scattered in the middle of the road. If the leading edge of the first truck's flatbed frame had been one foot over the center line of the highway, it stands to reason that the truck's mirror would have been even further over into the van's lane of travel. If this had been the case, it is reasonable to assume that the broken mirror glass would be scattered mostly on the van's side of the road.

The credible evidence further established that Mr. Cox had driven the same type of military truck on this same road in the past without incident. Although the plaintiff claims that the truck, when measured from side-view mirror to side-view mirror, was too wide for the road, this evidence was refuted by the measurements taken by the police officers. The south-bound lane of travel from the edge of the asphalt to the center crease line in the middle of the road was ten feet. The lead truck's overall width from side mirror to side mirror was 9 feet, 8 inches. Although the width inside the painted lines of the south-bound lane was only nine feet, considering the width of the painted lines and the gaps between them, together with Cox's credible testimony that he kept the right front tire along the right side of the road, the undersigned finds that there was sufficient room for this truck to be on this highway without any part of it protruding into the van's lane of travel. Moreover, as both expert witnesses testified, the collision of the side-view mirrors did not cause this accident. Rather it was the van's striking of the front left edge of the truck's flatbed that caused it's left front tire to rupture and the van to crash into the second truck. Accordingly, even if the lead truck was found to be in technical violation of N.C.G.S. § 20–116 by being wider than the 96 inches allowed by that statute, such extra width, attributable to the side view mirrors, was not the proximate cause of this accident.

## III. CONCLUSION

There is no doubt that Arthur Dalton Reynolds was a good man, or that his tragic and untimely death has been an enormous loss to his wife and daughter. However, under our system of laws, in order for the victims of such a tragedy to obtain a monetary judgment against another, be it an agent of the government or a private person, they must establish by a preponderance of the evidence that the loss was proximately caused by some negligent act or omission of the defendant. In this case, the credible evidence established that the National Guard trucks were properly on their own side of the road, and that the drivers committed no negligent act or omission. The credible evidence further established, as painful as it may be for the family to recognize, that Mr. Reynolds negligently drove his van across the midline of the highway, sideswiped the first National Guard truck, lost control of his van, and then crossed the midline of the highway

again to crash head on into the second National Guard truck. On such evidence, the plaintiff has clearly failed to carry her burden of proof, and her claim against the United States must fail.

## IV. DECISION

Wherefore, on the basis of the foregoing, *IT IS HEREBY ORDERED* that the Plaintiff have and recover nothing of the Defendant and that Judgment in this case be entered for the Defendant. Each side is to bear its own costs. The Clerk is directed to prepare, file and issue a standard Clerk's Judgment in favor of the Defendant, and to certify a copy of that judgment along with this memorandum of decision to counsel for the parties in this case.